John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California 91103
Telephone: 626-449-8300/Facsimile:  626-440-5968

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM CAIN, individually and on behalf of all others similarly situated, | NO.    2:21-CV-7401 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| JPAY, INC.; METROPOLITAN COMMERCIAL BANK; and PRAXELL INC., | |
| Defendants. | **JURY TRIAL DEMANDED** |

## I.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, namely 42 U.S.C. § 1983 and 15 U.S.C. § 1693.

2.     This Court may exercise supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

CLASS ACTION COMPLAINT FOR DAMAGES – 1

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because each Defendant is subject to personal jurisdiction in this District and a substantial part of the events or omissions giving rise to the claim occurred within this District.

## II.   INTRODUCTION

4.     Plaintiff Adam Cain ("Plaintiff" or "Mr. Cain"), on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendants JPay, Inc. ("JPay"), Metropolitan Commercial Bank ("MCB"), and Praxell Inc. (together, "Defendants").

5.     Individuals taken into custody have their cash taken from them, which is held for them until they are released. Incarcerated individuals may also have money added to their account during detention. These funds are required to be returned when a person is released from custody. Traditionally, prisons and jails would return money to prisoners via cash or check. Some detention facilities, however, require persons being released to receive these funds through a prepaid debit card ("release card") that has limitations and charges various fees.

6.     This is true for Mr. Cain and the other Class members who were arrested and detained. Any cash they had was confiscated and held for them until they were released. Additional cash they received during incarceration and their state-provided release funds, sometimes referred to as "gate money," was also held in trust for them until release.

7.     Defendants are for-profit enterprises that contract with detention facilities to obtain the right to return inmate funds through their Defendants' debit cards ("release cards"). This is not an altruistic arrangement. Defendants make millions of dollars from the release cards because of the fees they charge for the

simple act of returning money owed to persons released from custody, including fees charged even if the card is never used.

8.   Defendants convinced the detention facilities to use them to return this money through release cards rather than in cash or by check. Defendants profited by charging "maintenance" fees to card recipients for simply possessing the card and other fees for withdrawing money or checking the account balance.

9.   Mr. Cain and the other Class members were victims of the Defendants' practices. Any cash they had was confiscated and held for them until they were released. Additional cash they received during incarceration and their state-provided release funds, sometimes referred to as "gate money," was also held in trust for them until release. Upon release, they received their money on release cards.

10.   Plaintiff, like other Class members, did not have the choice of receiving his cash back with the rest of his personal property. If Plaintiff and other Class members wanted their money returned, they had to take the release card. They approached the release desk expecting the return of their cash but instead became involuntary customers of a prepaid debit card program that automatically took fees from the money they were owed.

11.   Defendants engaged in a pattern of unlawful, deceptive, unfair, and illegal profiteering from persons released from jails and prisons. In so doing, Defendants have violated the Fifth Amendment's prohibition against the taking of property without just compensation. Defendants also violated the Electronic Fund Transfer Act's ("EFTA") prohibition against issuing an activated prepaid debit card unless the recipient specifically requests a card before it is issued and then only if the recipient requesting the card is provided a copy of the terms and conditions for

the card before it is issued. Here, neither Plaintiff nor other Class members requested release cards and did not receive copies of the cardholder terms and conditions until after the card was issued (if at all). It is also illegal under the EFTA for the Defendants to charge service fees on their release cards unless the cards had been used for 12 months or more. Defendants illegally began collecting service/maintenance fees within 30 days of issuing the cards.

12.    Thus, Plaintiff brings this action on behalf of himself and other releasees who were forced to accept fee-laden release cards from Defendants to obtain money being held for them. Plaintiff and other Class members were entitled to receive the money held in trust for them without paying fees and other expenses to Defendants. Nor were the Defendants entitled to impose requirements or obligations on Plaintiff and members of the Class that had to be met to avoid having Defendants take money from them.

### III.  PARTIES

13.    Plaintiff Adam Cain resides in Anaheim, California. He was formerly incarcerated at the Chuckawalla Valley State Prison. While incarcerated he served as a firefighter.

14.    Defendant JPay, Inc. ("JPay"), a wholly owned subsidiary of Securus Technologies, Inc., is incorporated in Delaware and located in Miramar, Florida. JPay touts itself as "the most trusted name in corrections" and offers myriad services to the correctional industry in over 30 states. JPay markets its release card program to government entities, who rely on JPay and the other Defendants to satisfy their obligations to return money to individuals being released from custody and reentering public life. JPay contracted with the California Department of Corrections and Rehabilitation ("CDCR") to provide release cards to individuals

released from California's prison facilities, including Chuckawalla Valley State Prison.

15.     Defendant Praxell, Inc. ("Praxell") is the Program Manager for the JPay release card program. It administers and markets the release card program. It also provides customer service for institutions using prepaid debit cards. Praxell is incorporated under the laws of Delaware and is located in New York, New York.

16.     Defendant Metropolitan Commercial Bank ("MCB") is a New York-based bank and a member of the FDIC. It is licensed by MasterCard to issue debit cards under its name. It partnered with Defendants JPay and Praxell to provide banking services for their release card program

## IV.  FACTS

17.     Chuckawalla Valley State Prison, like all jails, prisons, and detention facilities, holds money belonging to an inmate until his or her release. Those funds are kept in trust with the understanding that they will be protected and returned to the inmate upon release.

18.     Traditionally, when individuals are released from jails, prisons, and other detention facilities, their money is returned in the form of cash or check.

19.     Beginning in 2014, CDCR has contracted with Defendant JPay and its team, Praxell and its partner banks, to provide various services including deposit kiosks for direct deposits into inmates' accounts and release cards. The CDCR was not charged for the release card program; instead, by obtaining the exclusive right to return money to releasees Defendants profit from the fees from the release cards.

20.     Chuckawalla Valley State Prison was one of the facilities included in the release card program and one of many facilities across the United States who have release card programs operating under the JPay banner.

21.     Under Defendant JPay's arrangements with these facilities, JPay, Praxell, its program manager, administrator, and marketer, and its partner banks, including Defendant MCB, obtain the money held for the Plaintiff and the Class members to fund the release cards, which are ready for use before being handed to releasees. Defendants did not obtain permission from Plaintiff or other Class members to use their money to fund and issue the release cards. At the time of their release, Plaintiff and other Class members were provided no alternative to receiving back their money other than becoming involuntary customers of Defendants' program.

22.     Defendants assess these fees and impose other obligations on Plaintiff and other Class members under the terms and conditions of a "cardholder agreement," which they claim is provided to released inmates when they receive a release card. Those terms and conditions do not reflect an agreement between Defendants and Plaintiff or members of the Class. Plaintiff and other Class members are not required to agree to pay fees or assume other obligations to receive back money they are legally entitled to. Plaintiff and the Class members are not contractually bound to the terms in the cardholder agreement, including its arbitration provisions, just because Defendants load an unrequested release card with money owed to them.

23.     Plaintiff and the Class members had no opportunity to negotiate or modify the terms and conditions imposed by the cardholder agreement and did not

even have the choice to reject the cardholder agreement if they wanted to receive back the money they were entitled to.

24.     The cardholder agreement is also illegal because the release card was not requested by the recipient before it was activated as required by the Electronic Fund Transfer Act. Because the claimed agreement is illegal, it was void from its inception and unenforceable.

25.     Defendants market their release card program to jails and other detention facilities, and directly and indirectly to members of the Class through traditional media and the Internet. In written materials and electronic media release card recipients are encouraged to use the release card in various ways resulting in additional fees and profits to Defendants.

26.     When Plaintiff was released from Chuckawalla Valley State Prison, he was issued a release card from Defendants for $213.50, which included the "gate money" he was entitled to by statute. At the beginning of October 2020, he had $4.87 remaining in his account, which was consumed by charges for fees, including a "monthly service fee." These fees were illegal under the Electronic Fund Transfer Act.

## V.   CLASS ACTION ALLEGATIONS

27.     **Class Definition**. Plaintiff brings this action on behalf of himself, and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following nationwide Class:  All persons in the United States (1) taken into custody at a jail, correctional facility, detainment center, or any other law enforcement facility, (2) entitled to the return of money confiscated from them or remaining in their inmate accounts when they were released from custody, and (3) who had those funds returned through a prepaid debit card provided by any

one or more of the following: Defendant JPay, Defendant Praxell, and/or Defendant MCB, within one year prior to the filing of the original Complaint in this action, and during its pendency, that was subject to fees, charges, or restrictions. This Class shall be referred to as the "Nationwide Class."

28.     Additionally, Plaintiff seeks to represent the following California subclass:   All persons (1) taken into custody at a jail, correctional facility, detainment center, or any other law enforcement facility within the state of California, (2) entitled to the return of money confiscated from them or remaining in their inmate accounts when they were released from custody, and (3) who had those funds returned through a pre-activated prepaid debit card provided by any one or more of the following: Defendant JPay, Defendant Praxell, and/or Defendant MCB, within four years prior to the filing of the original Complaint in this action, and during its pendency, that was subject to fees, charges, or restrictions. This Class shall be referred to as the "California Subclass." The Nationwide Class and the California Subclass are collectively referred to herein as the "Class."

29.     **Numerosity**. The Nationwide Class and the California Subclass are both so numerous that joinder of all members is impracticable. Each Class has more than 1,000 members.

30.     **Common Questions**. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Questions of law and fact common to the Class include but are not limited to:

a)     Did Defendants violate the Electronic Fund Transfer Act by issuing a prepaid fee-laden debit card with money obtained

without permission from a consumer when the consumer also did not request that card?

b)    Did Defendants violate the Electronic Fund Transfer Act by obtaining the releasee's money and activating the release card in the releasee's name before providing that person the information required by the Act?

c)    Did Defendants violate the Electronic Fund Transfer Act by charging fees expressly prohibited by the act?

d)    Did Defendants' return of detainees' funds in the form of a fee-laden debit card constitute a taking of their property without just compensation?

e)    Did Defendants' failure to return all of the detainees' funds to them support claims of conversion and unjust enrichment against Defendants?

31.    **Typicality**. Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent: (a) He and the other Class members were arrested and detained at detention facilities where their personal possessions, including cash, were confiscated; (b) Without their permission or knowledge, their cash was transferred to fund debit card accounts controlled by Defendants; (c) He and the other Class members had to accept fee-laden release cards to retrieve their money; (d) Defendants placed restrictions on how the card recipients could obtain their money; and (e) Mr. Cain and other Class members were charged fees they never agreed to for merely accessing their money, checking the balance on the release card, or doing nothing at all.

32. **Adequacy of representation**. Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in both complex class action and consumer fraud litigation. Plaintiff has no interests adverse to or in conflict with the interests of the other members of the Class.

33. **F.R.Civ.P. 23(b)(3) requirements**.

   a) **Common issues predominate.** The universal question in this case is whether Defendants improperly took funds from Class members to issue unrequested prepaid debit cards instead of simply returning their money to them. Defendants' program, however, was not developed to easily return money to Class members but, rather, to profit from any delay or difficulty Class members had in trying to retrieve their money from these cards. Defendants' conduct raises questions of liability under the EFTA that are uniform among the Class members and predominate over individual issues.

   b) **A class action is superior to other methods of adjudicating the claims in this action**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of thousands of Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would

assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. The interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual Class members may be relatively small. Therefore, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. Plaintiff anticipates no difficulty in management of this action as a class action.

## VI.  FIRST CAUSE OF ACTION:  CLAIM FOR WRONGFUL TAKING UNDER THE

## FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

34.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations of the paragraphs above.

35.    The Takings Clause of the Fifth Amendment to the United States Constitution states in relevant part that "private property [shall not] be taken for public use, without just compensation."

36.    The Takings Clause is applicable to the states through the Fourteenth Amendment.

37.    A governmental user fee that fails to bear a sufficient relationship to the value received or fails to provide a fair approximation of the costs of the benefits supplied – if any – constitutes a taking within the meaning of the Takings Clause.

38.    Defendants engaged in state action under color of law by performing the traditional governmental function of returning Plaintiff's and the Class members' property through their debit card program. Defendants are persons for whom the State is responsible in that:  (a) Chuckawalla Valley State Prison, and other governmental entities that issue Defendants' prepaid debit release cards, bore an affirmative obligation upon release of Plaintiff and the Class and to return monies confiscated from them; (b) the state facilities delegated that function to Defendants and gave to Defendants Plaintiff's and the Class members' confiscated money; and (c) Defendants voluntarily assumed that obligation by contract. Defendants thereby deprived Plaintiff and the Class of a right, privilege, or immunity protected by the Constitution or the laws of the United States.

39.    The state facilities benefited from the actions of its delegee, as Defendants' business practices allowed the state facilities to administer a "cashless" inmate property release system and save the costs associated with their own management of the inmate property release system and issuance of checks. The state facilities negotiated their delegation contract with Defendants, and knowingly assented to Defendants' fee structure as a means to transfer its costs onto Plaintiff and the Class.

40.    Plaintiff and the Class possessed a constitutionally protected interest in the monies Defendants took from them.

41.     Defendants' card user fees are excessive, unreasonable, unrelated to the administration of the users' accounts, and are imposed without regard to what, if any, benefit the users received.

42.     Defendants' excessive and unreasonable card fees should be declared to constitute a taking of property in violation of the Fifth Amendment of the United States Constitution.

43.     Defendants should be ordered to compensate Plaintiff and the Class for the taking of property.

44.     Plaintiff and the Class are entitled to their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b) (2000).

## VII.  SECOND CAUSE OF ACTION:  ELECTRONIC FUND TRANSFER ACT

45.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations of the paragraphs above.

46.     The primary objective of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 is to protect consumer rights by providing a basic framework establishing the rights, liabilities, and responsibilities of participants in the electronic fund and remittance transfer systems. Plaintiff and members of the Nationwide Class are "consumers" under 15 U.S.C. § 1693a(6).

47.     Under 15 U.S.C. § 1693i(a) of EFTA, "no person" may issue an unsolicited prepaid debit card to a consumer unless it is (1) issued in response to the consumer's request or an application from the consumer or (2) it is issued to renew an existing prepaid debit card or obtain a substitution for an existing prepaid debit card. The release cards issued to Plaintiff and members of the Nationwide Class do not meet either requirement.

48.     Under 15 U.S.C. § 1693i(b) of EFTA, "a person" may nonetheless distribute an unsolicited prepaid debit card to a consumer if all of the following requirements are met:

a)     The unsolicited card is not yet "validated" (*i.e.*, activated) and is accompanied by a "clear explanation" that it is not validated, which describes the steps that the consumer can take to dispose of the card if the consumer does not want to activate it. 15 U.S.C. § 1693i(b)(1), (2).

b)     Prior to the card being validated, the consumer is provided with a complete disclosure under section 1693c of EFTA of the consumer's rights and liabilities that will apply if the consumer subsequently chooses to activate the card. 15 U.S.C. § 1693i(b)(2), (3).

c)     The card will be activated, and the consumer subject to the terms of a cardholder agreement, "only in response to a request or application from the consumer, upon verification of the consumer's identity." 15 U.S.C. § 1693i(b)(4).

49.     Defendants JPay, Praxell, and MCB are each "a person" subject to the requirements and restrictions of 15 U.S.C. § 1693i. Each Defendant violated 15 U.S.C. § 1693i(a) by issuing unsolicited prepaid debit cards to Plaintiff and members of the Nationwide Class. None of these Defendants satisfied the requirements of 15 U.S.C. § 1693i(b) to obtain an exception that would have allowed unsolicited prepaid debit cards to be issued to Plaintiff and members of the Nationwide Class.

50.     Each Defendant is also a "financial institution" as defined by 15 U.S.C. § 1693a(9), and 12 C.F.R. § 1005.2(a)(2)(i), and is liable as such under EFTA because it directly or indirectly holds accounts belonging to consumers and/or it issues an access device (prepaid debit card) to consumers.

51.     Each Defendant also violated 15 U.S.C. § 1693l-1, which prohibits charging service fees to "general-use prepaid cards" unless the card has not been used for 12 months and other requirements have been met. Because Defendants require Plaintiff and the Class to "establish an account for receipt of electronic fund transfers with a particular financial institution as a condition of … receipt of a government benefit," Defendants also violate 15 U.S.C. § 1693k(2).

52.     The release cards issued to Plaintiff and other members of the Nationwide Class are general-use prepaid cards that are marketed directly and indirectly to members of the Nationwide Class. Defendants charge service and maintenance fees that begin within the first month after the release cards are issued.

53.     The terms and conditions issued by Defendants with the release cards are *void ab initio* because the cards they accompany are issued illegally.

54.     EFTA regulates the precise form of assent necessary to make the terms and conditions binding on the consumer. Assent to the issuance of the card (and its corresponding terms and conditions) can only occur "in response to a request or application from the consumer." 15 U.S.C. § 1693i(b)(4). The consumer must also be provided the terms and conditions before the card is validated so that the consumer can decide whether to accept those terms. 15 U.S.C. § 1693i(b)(2). No other form of assent is recognized by statute. 15 U.S.C. § 1693i(a), (b). As a result, a consumer cannot be said to have "assented" to a contract for a card by simply

taking it upon release, or subsequently using the card. The release cards were validated before they were even provided to the Plaintiff and other Nationwide Class members. No "request" or "application" preceded validation of those cards.

55.     No contract or agreement was formed between any Defendant and Plaintiff or other Nationwide Class members. No Defendant had the authority to assert the terms and conditions imposed on Class members, including the right to withdraw funds from Plaintiff and Nationwide Class members to pay various fees and expenses to Defendants.

56.     Each Defendant's violations of EFTA have caused and continues to cause Plaintiff and the Nationwide Class to suffer damages.

57.     Plaintiff and the Class are entitled to their actual and additional statutory damages, as well as reasonable attorneys' fees and costs, pursuant to 15 U.S.C. § 1693m.

## VIII. THIRD CAUSE OF ACTION:  CONVERSION

58.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations of the paragraphs above.

59.     Money from Plaintiff and other members of the California Subclass was taken in trust to hold during their incarceration. By law, these funds were required to be returned to Plaintiff and the other members of the California Subclass.

60.     Conversion occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession. Money may be the subject of conversion if Defendants wrongfully received it.

61.     Defendants, exercising their control over the funds in the release card accounts, wrongfully collected fees from Plaintiffs and members of the California Subclass, and have taken specific and readily identifiable funds from Plaintiff and the members of the California Subclass in payment of these fees.

62.     Defendants, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the California Subclass, without legal justification.

63.     Defendants continue to retain these funds unlawfully and without the consent of Plaintiff or the California Subclass.

64.     Defendants intend to permanently deprive Plaintiff and the California Subclass of these funds.

65.     These funds are properly owned by Plaintiff and the California Subclass, not Defendants, which now claim that they are entitled to their ownership, contrary to the rights of Plaintiff and the California Subclass.

66.     Plaintiff and the California Subclass are entitled to the immediate possession of these funds.

67.     Defendants wrongfully converted these specific and readily identifiable funds.

68.     Defendants' wrongful conduct is continuing.

69.     As a direct and proximate result of Defendants' wrongful conversion, Plaintiff and the California Subclass have suffered and continue to suffer damages.

70.     Plaintiffs and the California Subclass are entitled to damages and prejudgment interest in an amount to be determined at trial.

## IX.  FOURTH CAUSE OF ACTION:  UNJUST ENRICHMENT

71.     Plaintiff re-alleges and incorporates by reference all allegations of this Complaint with the same force and effect as if fully restated herein.

72.     Defendants have been unjustly enriched by taking funds from the release card accounts under their control through fees assessed upon Plaintiff and the California Subclass.

73.     It is unjust and inequitable for Defendants to retain the benefit they unjustly received from Plaintiff and the California Subclass members.

74.     Plaintiff and the California Subclass members unintentionally conferred benefits on Defendants, which Defendants have knowingly accepted and retained.

75.     Plaintiffs and the California Subclass members have suffered and continue to suffer actual damages from Defendants' unjust retention of proceeds from their acts and practices alleged herein.

76.     Plaintiff and the California Subclass members seek to disgorge Defendants' unlawfully retained benefits resulting from their unlawful conduct and seek restitution for the benefit of Plaintiff and the California Subclass.

77.     Plaintiff and the California Subclass members are entitled to the imposition of a constructive trust upon Defendants, such that the unjustly retained benefits are distributed equitably by the Court to and for the benefit of Plaintiff and the California Subclass members.

## X.   FIFTH CAUSE OF ACTION: CALIFORNIA UNFAIR COMPETITION LAW

78.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations of the paragraphs above. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. California's UCL is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice that causes injury to consumers.

79.     Defendants' acts and practices are unlawful, fraudulent, and unfair business practices. Among other things, (1) their practices violate the United States Constitution and federal statutes as identified in this Complaint; (2) any justification for Defendants' conduct is outweighed by the gravity of the consequences to Plaintiffs and the Class members; and (3) Defendants' conduct is immoral, unethical, oppressive, unconscionable, and/or substantially injurious to Plaintiffs and Class members.

80.     Defendants' unfair business acts and practices, include: exploiting their position of power to benefit and profit from vulnerable persons who reenter society; wrongfully opening accounts without customer authorization or agreement; starting services without customer approval or authorization; and using customers' personal and state-issued money in illegitimate accounts to pay for fees, costs, and other penalties related to accounts Defendants opened without the consent, knowledge, or authorization of Plaintiff and Class members.

81.     Plaintiff and Class members have been injured by Defendants' violations of the UCL. They are entitled to damages resulting from those violations

including, but not limited to, disgorgement of fees and interest and other benefits received by Defendants from retaining money belonging to Plaintiff and Class members.

## XI.  PRAYER FOR RELIEF

Plaintiff, on behalf of himself and the Class, requests the following relief:

1.    An order certifying this case as a class action and appointing Plaintiff and the undersigned counsel to represent the Nationwide Class and the California Subclass;

2.    Declaration, judgment, and decree that Defendants:

     a)    Violated the Fifth Amendment to the United States Constitution,

     b)    Violated the Electronic Fund Transfer Act,

     c)    Illegally converted property belonging to Plaintiff and members of the California Subclass, and

     d)    Were unjustly enriched at the expense of Plaintiff and the California Subclass.

3. An award of damages to Plaintiff and the Nationwide Class and the California Subclass to the maximum extent allowed under state and federal law, including ordering Defendants to pay actual and statutory damages;

4. Judgment for costs and disbursements of the action;

5. Restitution and/or disgorgement of ill-gotten gains;

6. Pre- and post-judgment interest;

7. Reasonable attorneys' fees; and

8. Such other relief, in law and equity, as this Court may deem just and proper.

DATED:  September 15, 2021.

THE LAW OFFICES OF JOHN BURTON

*s/ John Burton*
John Burton
Attorneys for Plaintiff

## XII.  DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury of all claims that can be so tried.

DATED:  September 15, 2021.

THE LAW OFFICES OF JOHN BURTON

*s/ John Burton*
John Burton
Attorneys for Plaintiff